**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

**KRISTINA MALIMON,**
**YEVGENIYA MALIMON**

      Plaintiffs,

v.

**T-MOBILE**

      Defendant.

Civil Action No._____

**COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**

PLAINTIFFS Kristina and Yevgeniya Malimon, by and through their counsel, van der Veen, Hartshorn and Levin, by Bruce L. Castor, Jr. for their Complaint against T-Mobile, state and allege as follows:

1.      This is an action to protect the Plaintiffs from a Congressional subpoena (the "subpoena") that lacks a lawful purpose and seeks to invade the Plaintiffs' constitutional rights to privacy and to confidential political communications. The Plaintiffs are two private citizens who were not involved in any federal government activities or programs. They have only one apparent connection to the matter Congress claims to be investigating: they were present outside the US Capitol Building on January 6, 2022 briefly at a peaceful, lawful, orderly and patriotic assembly to promote First Amendment-protected speech. Despite this, the Plaintiffs were charged with criminal offenses currently listed for trial in DC Superior Court on October 3, 2022. The Plaintiffs, one of who does not speak English did not know what was happening when they were, literally, caught in a "net" of metal fencing within minutes of arrival.  If Congress wanted to know anything more about the Plaintiffs' brief involvement with the

events it could have asked and so far has chosen not to do so. Instead, Congress pivoted to Defendant T-Mobile, their telecommunications carrier, to indiscriminately demand detailed information about their accounts, contacts, personal and political associates, and physical locations. The subpoena covered a three-month period that greatly exceeds the less than 10-minute window of time Plaintiffs were engaging in peaceable assembly on January 6, 2021 before being arrested.

2.      The subpoena was not issued by a validly constituted committee; is not pertinent to the matter Congress is purporting to investigate; does not pursue a legislative purpose; violatesthe Plaintiffs' First and Fourth Amendment rights; and violates the Stored Communications Act, 18 U.S.C. § 2701, et seq. The Plaintiffs seek a judgment declaring that the subpoena invalid and enjoining Defendant, T-Mobile, from producing their data to the Select Committee.

## **THE PARTIES**

3.      Plaintiffs Kristina Malimon and Yevgeniya Malimon (daughter and mother, respectively) are residents of Portland, Oregon.  On June 2, 2022, they received notice from Defendant that Defendant was served with a subpoena for their cell phone records, attached hereto along with the transmittal letter as Exhibit A.[1]  The subpoena is dated May 17, 2022 ordering production in person by Defendant to the Select Committee in Washington DC on May 31, 2022.  Thus, by the time Plaintiffs received notice from Defendant of the issuance of the subpoena, the date by which the Select Committee required Defendant's compliance had already passed, making compliance with the terms of the subpoena impossible on account of

---

[1] The subpoena contained in Exhibit A appears to be missing one or more pages as received by Plaintiffs.  Assuming the subpoena itself is "Page 1" (not specified as such on its face), the remaining pages are marked "Page 3" and "Page 4" which begs the question of what happened to "Page 2?"

the subpoena being moot as expired. Plaintiffs are also presently criminal defendants in DC Superior Court for the District of Columbia ("DC Superior Court") with actions indexed at 2021 CMD 00195 (Kristina) and 2021 CMD 00156 (Yevgeniya) scheduled for trial on October 3, 2022.

## JURISDICTION AND VENUE

4.      This case challenges the validity of a subpoena issued by a body calling itself the Select Committee to Investigate the January 6th attack on the United States Capitol (the "Select Committee"). It raises claims regarding the scope of the investigative power of Congress under Article I of the United States Constitution, claims arising under the First, Fourth, and Fourteenth Amendments of the United States Constitution, and claims arising under the Stored Communication Act, 18 U.S.C. § 2701, et seq.

5.      The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343. The Court has personal jurisdiction over Defendant T-Mobile because it has significant contacts within the Eastern District of Pennsylvania, does substantial business there, markets its products and services within the Eastern District, and has multiple physical places of business in the Eastern District of Pennsylvania with at least 39 business locations in the City of Philadelphia alone and dozens more throughout the entirety of the jurisdiction of the Eastern District.

6.      For the same reasons, this Court has personal jurisdiction, venue in this Court is proper under 28 U.S.C. § 1391(b).

## BACKGROUND ALLEGATIONS

7.      On January 6, 2021, a group of protesters breached the Capitol grounds, entered the Capitol.

8.      On June 30, 2021, the House of Representatives passed H. Res. 503 (the "Resolution"), establishing "the Select Committee to Investigate the January 6th Attack on the United States Capitol." The Resolution was passed just two days after its introduction, with just two Republican Members voting "yea."

9.      Under Section 2(a) of the Resolution creating the Select Committee, "the Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." The Resolution also required that "[t]he Speaker shall designate one Member to serve as chair of the Select Committee." H. Res. 503 § 2(b), 117th Cong. (2021).

10.     The Speaker appointed just nine Members to the Select Committee. The Speaker did not appoint *any* Members in consultation with the House Minority Leader, Representative Kevin McCarthy. Rather, the Speaker appointed just the same pair of Republican Members who had voted for the Resolution. Not a single Member out of the nine on the Select Committee had opposed the creation of the Committee.

11.     The Speaker did not appoint a Ranking Member. The Select Committee does not have a Ranking Member.

12.     The Resolution enabling the Select Committee identifies a total of three "*purposes*" for the Select Committee. They are: (1) to "investigate and report upon the facts, circumstances, and causes relating to the January 6, 2021 domestic terrorist attack on the United States Capitol Complex… and relating to the interference with the peaceful transfer of power, including the facts and causes relating to the preparedness and response of [law enforcement and other instrumentalities of government], as well as the influencing factors that fomented such an attack…"; (2) to "examine and evaluate evidence developed by relevant

Federal, state, and local government agencies regarding the facts and circumstances surrounding the domestic terrorist attack on the Capitol and targeted violence and domestic terrorism relevant to such terrorist attack"; and (3) to "build upon the investigations of other entities and avoid unnecessary duplication of efforts by reviewing the investigations,findings, conclusions, and recommendations of other [investigations] into the domestic terrorist attack on the Capitol, including investigations into influencing factors related to such attack."

13.     The Resolution identifies a total of three "*functions*" of the Select Committee. They are: (1) to "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) to "identify, review, and evaluate the causes of and the lessons learned from the domestic terrorist attack on the Capitol regarding" various federal governmental operations; and (3) to "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures described in subsection (c) as it may deem necessary."

14.     Subsection (c) of Section 4 describes three categories of "*corrective measures*": "changes in law, policy, procedures, rules, or regulations that could be taken" (1) "to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American democratic institutions"; (2) "to improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans"; and (3) "to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism."

15.     The Select Committee has established a website that reports on its proceedings and publishes statements by the Select Committee's Speaker-designated Members—that is, the

Select Committee's only Members. See https://january6thhouse.gov/

16.     The Select Committee held periodic meetings and, in fact, is scheduled to hold "prime time" meetings during the week of June 6, 2022 even hiring expert television producers to produce a "tv friendly" broadcast to showcase the Select Committee's Democrat Speaker-appointed members' efforts to date.

17.     The Select Committee's Chairman wrote to over thirty telecommunications and social media companies to demand that they preserve all meta data and content of their customers' communications, and that they not disclose the Chairman's demand to their customers because the Chairman did not want American citizens to know that the US Government intended to invade their privacy at will. Upon information and belief, the Plaintiffs' accounts were included in this demand, because they are charged with crimes arising out of the events of January 6, 2021.

18.     Upon information and belief, at least some of the recipients of the letter, includingT-Mobile, were required to copy account and content data in order to protect it from automated deletion and comply with the Select Committee's preservation demand presumably on pain of Contempt of Congress.

19.     On May 17, 2022, the Select Committee issued a subpoena to the Defendant for the production of documents, though Plaintiffs did not know a subpoena had been issued until Thursday June 2, 2022.  Plaintiffs sought advice of undersigned counsel who began reviewing the issue on Monday June 6, 2022.  Defendant insisted via email that any objection to its producing of information pursuant to the subpoena must be filed with the Court no later than June 10, 2022 or Defendant would comply with the now outdated and moot subpoena. Undersigned counsel emailed counsel for T-Mobile requesting a three-business day extension

within which to file in objection.  To date, counsel for T-Mobile has not responded to that request.

20.     The Select Committee has long had access to the results of a separate investigation of the events of January 6 conducted by the Federal Bureau of Investigation. That investigation focused on the individuals who actually breached the Capitol on January 6. At no time has that investigation suggested that there was any centralized organization or planning for the breach, that the Plaintiffs could conceivably have information about anyone who performed that role, or that the Plaintiffs ever had contact with such a person. The Select Committee already knows or should know that these Plaintiffs could not possibly have had contact with individuals who planned or participated in the Capitol breach.

21.     Since June 2021,the Select Committee claims to have interviewed 250 witnesses. See https://january6th.house.gov/news/press-releases/thompson-cheney-opening-statements-rules-committee-meeting-0. In short, with respect to the Ellipse Rally, there can be little if anything that is not known to the public or the Select Committee. That is certainly true regarding any information the Plaintiffs may have.

22.     Nonetheless, on or about May 17, 2022, the Select Committee issued a subpoena to Defendant T-Mobile, demanding production of a mass of cell phone data for Plaintiffs by 10:00 a.m. on May 31, 2022, something impossible to do now that the date has passed, and Plaintiffs given untimely notice by Defendant on June 2, 2022.

23.     The May 17 subpoena to T-Mobile—the only subpoena at issue here (Exhibit A)— clearly covered a number of individuals. "Part A" of the Subpoena explains its scope. "Part B" of the Subpoena apparently included the phone numbers of many T-Mobile customers whose account data was being subpoenaed, and for that reason, T-Mobile did not transmit Part

B to the account recipients.

24.     According to Part A, the Select Committee seeks all subscriber information and cellphone data associated with the Plaintiffs' personal cell phone numbers. The subscriber information requested includes subscriber names and contact information, authorized users, time of service provided, account changes, associated IP addresses, and other metadata. The cell phone data requested could include all calls, text messages, and other records of communications associated with that phone number. This data can also be used for historic cell site analysis.  See Exhibit A.

25.     Additionally, despite the fact that these Plaintiffs' involvement with the Ellipse Rally one day, January 6, 2021, the Select Committee sought their personal cell phone data for three months: from November 1, 2020 to January 31, 2021. The Select Committee is well aware that Plaintiffs cannot have had relevant communications this late or this early in time.

26.     Assuming that dozens or perhaps hundreds of other individuals' private data is being sought with the same one-size-fits-all, multi-month request that fails to match the specific relevance (if any) of a given individual to the investigation, the Select Committee is clearly "fishing" for information in the hope of uncovering incriminating evidence but without probable cause to believe relevant information will be found should Defendant surrender Plaintiffs' private data in response to the expired subpoena.

27.     Instead, the Select Committee's subpoena will yield data that will be used to populate a massive database of the personal friends and political associates of not just Plaintiffs, but everyone who has had any connection to the Trump campaign or other political associations or vendors who worked with it. By analyzing data patterns in phone numbers, length of calls, texts, and geolocation data, investigators can build a permanent nationwide

model of intimate political associations and networks within the conservative movement that has relevance far beyond "legislating" to deal with Capitol security, election integrity, or the processes for certifying electoral votes. The billions of data points yielded can recreate not just intimate relationships, but also locations and movements, creating a virtual CAT-scan of the Select Committee's political opposition, likely including even their own colleagues in the House of Representatives.

28.     This massive opposition research project dwarfs anything ever attempted or conceived in the history of the Congress. It bears more similarity to a foreign intelligence operation or a domestic criminal investigation than to a good-faith effort to secure the facts needed to draft legislation or oversee an executive agency. The Select Committee has lost its bearings.

## Count I
**(Subpoena Is Invalid Because the Select Committee Is Not Properly Constituted)**

29.     Plaintiffs repeat, re-allege, and incorporate the allegations in paragraphs 1–28 as if the same were set forth *verbatim* herein.

30.     The power of authorized congressional committees to issue subpoenas arises by implication from Article I of the Constitution. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927).

31.     The Select Committee, however, is not an authorized congressional committee because it fails to comport with its own authorizing resolution, House Resolution 503.

32.     The Speaker of the House failed to appoint members consistent with the authorizing resolution of the Select Committee. The Speaker has appointed only nine Members of Congress to serve on the Select Committee; whereas the authorizing resolution instructs that the Speaker "shall" appoint thirteen members. H. Res. 503 § 2(a), 117th Cong. (2021).

33.     Further, of those nine Members the Speaker has appointed, none of them was appointed after consultation with the Minority Leader, as is required by Section 2(a) of the authorizing resolution.

34.     The composition and membership of a purported committee, including the Select Committee, is material to its power to act. A committee's composition and membership can determine the direction of an inquiry and can serve to check, or temper committee actions that could otherwise prove injurious to the operation of the government or the rights of private citizens. A committee that, without any check exclusively serves the political purposes of one political party or faction is susceptible to grave constitutional error and overreach.

35.     Here, the Select Committee has embarked upon an investigation that began with an inquiry into January 6th, but, in the absence of any tempering influence from the opposition party, has transformed into a broad assault on the Select Committee's political opponents, including private citizens.

36.     The Select Committee's failure to ever become properly constituted is a material violation of its authorizing Resolution. A private citizen aggrieved by a material violation of House rules has a defense against compulsory process. In *Yellin v. United States*, 374 U.S. 109, 114 (1963), the House Unamerican Affairs Committee failed to follow Rule IV, which required the committee to weigh certain considerations and act upon the express request of Yellin, the witness, for executive session because he believed his public testimony would harm his reputation. The Court held that because the committee had not followed Rule IV, Yellin could not be convicted for contempt of Congress for failing to answer questions about his political affiliation and activities. It was not necessary to the Court's decision in *Yellin* that the committee would or should have granted Yellin's request for private, executive session

testimony; the holding rests upon the committee's failure to actually apply Rule IV in considering his request. As *Yellin* shows, then, the House's failure to follow a rule is particularly significant where a person's fundamental rights are involved. That is the case here, where Plaintiffs' First and Fourth Amendment rights have been implicated by issuance of the subpoena in light of their pending criminal charges in DC Superior Court.

37.     Thus, because the Select Committee as it currently stands—and stood at the time it issued the subpoena in question—is not a duly constituted Select Committee under the applicable resolution, it has no authority to act by issuing compulsory process against private entities and citizens. Chairman Thompson's subpoena are invalid and unenforceable as well as facially defective having been served after the return date had passed.

### Count II
### (Subpoena Is Not Pertinent to the Authorized Inquiry)

38.     Plaintiffs repeat, re-allege, and incorporate the allegations in paragraphs 1–37 as if the same were set forth verbatim herein

39.     The Select Committee's supposed inquiry focuses on the events of January 6 leading up to the Capitol breach, factors that may have caused individuals to enter the Capitol without permission, and the statutory process of certifying states' electoral votes.

40.     These Plaintiffs were peaceful observers for an event that took place over a few hours away from the Capitol and earlier on the day of January 6, 2021 and returned to the Capitol grounds for only a few minutes to peacefully watch the gathering before being arrested for reason unknown to them at the time. Criminal charges are pending against them presently with a scheduled trial date of October 3, 2022.  The Plaintiffs' cell phone account information cannot aid Congress in drafting legislation about the January 6 Capitol breach, its causes, or the statutory process for transferring power. The same is true of the Plaintiffs' complete record of

phone calls and texts, the time spent conferring with various individuals who are political and personal associates of Plaintiffs, and their location data over a three-month stretch of time, long before and long after the events of January 6.

41.    There was no evidence adduced from any Plaintiff, and upon information and belief there is no evidence from any witness, that these Plaintiffs participated in or planned to organize an attack on the Capitol. Nor was there any evidence that these Plaintiffs participated in or planned even a peaceful assembly—a "march," copying the parlance of numerous public gatherings held on the National Mall—to the Capitol.

42.    There was no evidence from these Plaintiffs, and upon information and belief, there was no evidence from any other witness, that these Plaintiffs participated in or planned speeches that were directed to, and were likely to, incite any kind of imminent unlawful activity.

43.    And there was no evidence from these Plaintiffs, and upon information and belief there was no evidence from any other witness, that anyone's speech at the Ellipse Rally actually led to an atmosphere of hatred, violence, or lawlessness, sufficient to cause otherwise peaceful attendees to surge to the Capitol and break in.

44.    The Select Committee claims to have already spoken with over 250 witnesses. See. https://january6th.house.gov/news/press-releases/thompson-cheney-opening-statements-rules-committee-meeting-0. Upon information and belief, it has reviewed hundreds of thousands or millions of documents that it has received from those witnesses. It is far past the outset of its investigation, and it is long past time for the Select Committee to have adduced the kind of evidence relating to the Plaintiffs that would suggest they are core subjects of the investigation, justifying the unusual step of a Congressional subpoena for phone records.

45.    There is no reason to believe that the full record of personal and political contacts of each Plaintiff, extending for nearly two months before the Rally (long before it was even a remote possibility) and continuing for a month afterwards, is necessary to advance any congressional purpose.

46.    It is significant that the T-Mobile Subpoena uniformly asks for three months of phone records for a large number of people, some of whom touch upon the Committee's inquiry for only a day or a few days. Yet the same uniform 3-month request was used for these Plaintiffs and, apparently, countless others.

47.    Plaintiffs' personal account information, and the complete record of their private phone and text contacts with all of their political and personal acquaintances for three months, is not pertinent to any inquiry into what happened on January 6, or its causes. Instead, it is an impermissible attempt to harass the Plaintiffs, identify their close colleagues, and potentially subject even those individuals and their carriers to subpoenas. Not only does this chill communication among these friends and political associates, it builds an opposition research file for the 2022 election cycle for the single party that mans, staffs, and controls the Select Committee.

48.    The "phone records" stage of the Select Committee's inquiry is not pertinent to the matters the House assigned to the Select Committee. *See, e.g., Watkins v. United States*, 354 U.S.178, 207-208 (1957) (the specific demand must be "pertinent to the question under inquiry"). For this reason alone, the subpoena should be quashed.

**Count III**
**(Subpoena Lacks a Legislative Purpose)**

49.    Plaintiffs repeat, re-allege, and incorporate the allegations in paragraphs 1–48 as if the same were set forth *verbatim* herein

50.    A subpoena must not only be pertinent to the matter under investigation, it must be directed to produce facts relevant to subject on which legislation may be had. *Trump v. Mazars USA, LLP,* 140 S.Ct. 2019, 2031, 207 L.Ed.2d 951 (2020) (regardless of whether a congressionalsubpoena is directed to the Executive branch or a private citizen, it must "concern [] a subject on which legislation could be had," and cannot "expose for the sake of exposure" or serve the purposeof "law enforcement").

51.    The House originally suggested that its inquiry into the "causes" of January 6 was intended to support potential legislation relating to Capitol security and the process of certifying electoral votes on January 6. More recently, it supplemented its list, claiming to be interested in passing legislation on "election integrity."

52.    In response to this Complaint and a stiffening legal response from other targets of compelled disclosure of purely private affairs, the Select Committee might suggest new legislativepurposes. But no conceivable area of election-related legislation justifies the compelled disclosure of purely private affairs especially information that could be used against defendants in pending criminal cases as is the case here. Congress does not truly lack the necessary background factual record, and it does not need to threaten private citizens with jail time so that it can craft wise election legislation. For example, the Select Committee may claim that we can minimize the risk of another January 6 by banning or limiting rallies such as those that occurred at the Ellipse and elsewhere, or by banning or limiting criticisms of election processes after the election. First, any such legislation would need to be within Congress's power under the First Amendment, an obstacle to any sort of prior restraint or viewpoint or content-based restriction on speech or assembly. Second, assuming for the sake of argument that any such constitutionally permissible legislation can be conceived, it would necessarily

14

cover an exceedingly narrow field. Within that field, Congress does not truly lack the information it needs to legislate. For example, with respect to these Plaintiffs, everything that happened and was said at the Ellipse Rally—everything needed to craft constitutionally permissible restrictions on rallies, if they are in fact needed—has long been a matter of public record. Whether the legislative purpose is Capitol security or election integrity, rally participants' purely private communications about lawful, peaceable activity are not part of the pertinent inquiry.

53.     Additionally, even if it were true that any of these legislative purposes are actually being explored by the Select Committee, they do not have any relationship to the Plaintiffs' phone records. There is no conceivable link—even a highly attenuated chain—between, say, the account and payment information from Plaintiffs, and any Capitol security measures that may be passed. The same is true of the months-long list of personal and political contacts and associates that the subpoena will yield. Rather than aiding Congress in weighing some hypothetical legislation, the contact information will be used to further harass Plaintiffs, chill their association with personal and political acquaintances, build an opposition research file for 2022 for the party that completely runs the Select Committee without any involvement from the minority, and chill talented people from lending their skills to the Select Committees' political opponents. Because "recipients of legislative subpoenas retain their constitutional rights throughout the course of an investigation," *Mazars*, 140 S.Ct. at 2031, this abuse of Congressional power renders the subpoena unenforceable.

## Count IV
### (Subpoena Violates the First Amendment Privilege)

54.     Plaintiffs repeat, re-allege, and incorporate the allegations in paragraphs 1–53 as if the same were set forth verbatim herein.

55.     The First Amendment creates a "right to associate for the purpose of speaking," *Rumsfeld v. FAIR*, 547 U.S. 47, 68 (2006), and "compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958); *Bates v. Little Rock*, 361 U.S. 516, 523 (1960) ("It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute an effective restraint onfreedom of association.") (brackets, ellipsis, & citation omitted).

56.     In cases of compelled disclosure, the Government must meet at least "exacting scrutiny," meaning that it must articulate a sufficiently important interest and show that the disclosure requirement is both substantially related to, and narrowly tailored to serve, that interest. *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 210 L. Ed. 2d 716 (2021). "Exacting scrutiny is triggered by state action which may have the effect of curtailing the freedom to associate, and by the possible deterrent effect of disclosure." *Id.* at 2388 (quotations and citationsomitted).

57.     "Narrow tailoring is crucial where First Amendment activity is chilled–even if indirectly– '[b]ecause First Amendment freedoms need breathing space to survive.'" *Id.* at 2384 (citing *NACCP v. Button*, 371 U.S. 415, 433 (1963)).

58.     The First Amendment Privilege does not only provide protection against Congressional legislation or against local abuses of authority, it provides protection against Congressional attacks on First Amendment association via investigations. *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539 (1963) (applying the First Amendment, holding that the legislature could not seek the membership list of a legitimate organization because it had no subordinating interest which was compelling); *Watkins v. United States*, 354

U.S. 178, 197-198(1957) ("the mere summoning of a witness and compelling him to testify, against his will, about his beliefs, expressions or associations is a measure of governmental interference" and can chill the witness and others from future speech and association).

59.     A subpoena to indiscriminately force disclosure of Plaintiffs' personal and political associates over a three-month period are precisely the types of invasive inquiries that the SupremeCourt has previously recognized can chill the exercise of First Amendment freedoms.

60.     Further, this is not a situation such as *Bonta*, where the government claimed it would comply with a legal duty not to disclose the compelled information. Here, the Select Committee has publicized much of what has been disclosed and has been active in the media in attempting to whip up sentiment against witnesses. There is no reason to believe that the information produced will be kept private or used only for limited purposes. Rather, the Plaintiffs'personal and political contacts may well find that they are the next to receive subpoenas.

61.     For the reasons discussed above, the subpoena does not appear to advance any legitimate government informational interest. And if the Select Committee has any remnant of an informational interest in learning these Plaintiffs' personal and political contacts, the three-month period of inquiry, apparently uniformly applied to all witnesses regardless of their role or connection to the investigation, is by definition not narrowly tailored to remnant of an interest. For that reason, the subpoena violates the Plaintiffs' First Amendment privilege and should not be enforced.

### Count V
### (Subpoena Violates the Fourth Amendment)

62.     Plaintiffs repeat, re-allege, and incorporate the allegations in paragraphs 1–61

as if the same were set forth verbatim herein.

63.     Under the Fourth Amendment, Plaintiffs have a reasonable expectation of privacy in information about who their personal and political contacts are, and how long they spoke or interacted with each of them. That is, the Plaintiffs and the public at large do not expect that Congress can simply obtain from their carriers, and then potentially disclose, their entire personal and political contact history and location history over a three-month period.

64.     Furthermore, since Plaintiffs are criminal defendants in a pending prosecution and Congress is most certainly a branch of the same Federal Government prosecuting Plaintiffs, Plaintiffs have a Fourth Amendment right to be free from unreasonable searches and seizures.  Here, the now-expired subpoena for three months' worth of Plaintiffs' records is unreasonable.

65.      Congress violated that reasonable expectation of privacy by indiscriminately seeking a mass of phone and text records that cannot have anything to do with the Capitol breach, the Ellipse Rally, politics, or Plaintiffs' pending criminal case.

66.     The subpoena should not be enforced as violative of the Fourth Amendment. *See Carpenter v. United States*, 138 S.Ct. 2206, 201 L.Ed.2d 507 (2018).

**Count VI**
**(The Subpoena Violates the Stored Communications Act to the Extent it Seeks Content)**

67.     Plaintiffs repeat, re-allege, and incorporate the allegations in paragraphs 1–66 as if the same were set forth *verbatim* herein.

68.     Here, the Subpoena may seek the actual content of communications, such as the content of texts transmitted by the carrier. They seek "all call, message (SMS & MMS), Internet Protocol ("IP"), and data-connection detail records associated with the Phone Numbers…" If contents of texts are "message… records" that are "associated with" the phone

number of a Plaintiff, then the subpoena does in fact request content.

69.     Upon information and belief, the Select Committee previously asked Defendant
T-Mobile to preserve a copy of the content of Plaintiffs' communications until further notice.
On information and belief, the Select Committee would not have made this request that content
be copied and preserved if it did not intend to subpoena content.

70.     Under the Stored Communications Act ("SCA"), Congress has no authority to
subpoena content from a carrier. See 18 U.S.C. §2702(a) and (b). Although content can be
disclosed to a "governmental entity" under specific, narrow circumstances, Congress is not a
"governmental entity" because, as the legislative branch, it is not a "department or agency of
the United States." 18 U.S.C. §2711(4). And no other provision in the SCA allows Congress to
access content.

71.     Accordingly, to the extent the Subpoena seeks content of the Plaintiffs'
communications that is held by Defendant T-Mobile, it should be declared invalid, and
Defendant should be enjoined from producing any such content.

**Count VII**
**(Congress Violated the Stored Communications Act by Demanding a Copy Be Made of
the Relevant Data)**

72.     Plaintiffs repeat, re-allege, and incorporate the allegations in paragraphs 1–71
as if the same were set forth *verbatim* herein.

73.     The Special Committee requested that Defendant and other carriers make a
backup copy of content and other account data in late August or early September 2021. At that
time, upon information and belief, T-Mobile had one year of data regarding Plaintiffs' texts,
calls, and location.

74.     Under the Stored Communications Act, Congress had no authority to make

such a request. Only a government entity can request backup and preservation of account data. 18 U.S.C. §2703(f). That request can be honored for no more than 90 days, and then may be renewed for an additional 90 days upon the government entity's request. *Id*. Congress is not a government entity under the SCA.

75.     Upon information and belief, Congress, knowing it lacked authority, attempted to coerce Defendant and other entities into silence by requesting that they not tell account holders of the request.

76.     Upon information and belief, Defendant made such a backup copy of Plaintiffs' data under pressure from Congress in late August or early September 2021. As a result of that action, data that Plaintiffs reasonably expected would otherwise have been deleted after one year, in the ordinary course of T-Mobile's business, was preserved. This included data from November 1, 2020 to January 31, 2021, as more than one year before the subpoena was served.

77.     For the reasons set forth in Counts I to VI, Congress had no authority to request Plaintiffs' data at all, with or without a further request to make a backup copy. The only purpose of a backup copy is to provide the means for Congress to obtain what it cannot lawfully receive. To the extent such a copy was made in August or September 2021, it allowed Congress to obtain information within the Subpoena window that would otherwise have been destroyed. That data should now be destroyed, and Plaintiffs' call, text, and location data should not be preserved other than for the one-year period T-Mobile observes in the ordinary course of business.

## **Prayer for Relief**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against the Defendant as follows:

1. A declaratory judgment that the subpoena is invalid and unenforceable;

2. A permanent injunction quashing the subpoena and future similar subpoenas for Plaintiffs' information;

3. A permanent injunction prohibiting Defendant from disclosing, revealing, delivering, or producing the requested information, or otherwise complying with the subpoena or future similar for Plaintiffs' information;

4. A permanent injunction requiring Defendant to destroy and refrain from producing any copy of Plaintiffs' account data that was made, or that would be produced, in violation of the Stored Communications Act;

5. Plaintiffs' reasonable costs and expenses, including attorneys' fees; and

6. All other preliminary and permanent relief to which Plaintiffs are entitled.

Dated: June 9, 2022                           Respectfully submitted,


**VAN DER VEEN, HARTSHORN, LEVIN**


*/s/ Bruce L. Castor, Jr.*
Bruce L. Castor, Jr. (PA Bar #46370)
1219 Spruce Street
Philadelphia, PA 19107
Phone: (215) 422-4194
Fax: (215) 546-8529
bcastor@mtvlaw.com